

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

May 29, 2025

**BY ECF & EMAIL**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      Re:    *United States v. Hirenkumar Patel*, 24 Cr. 540 (KMK)

Dear Judge Karas,

      The Government respectfully submits this letter in advance of the sentencing of defendant Hirenkumar Patel, currently scheduled for June 5, 2025. The defendant pled guilty, pursuant to a plea agreement, to one count of conspiracy to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 371, and one count of operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Sections 1960 and 2. The applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 30 to 37 months' imprisonment, as stipulated to under the parties' plea agreement and as correctly calculated by Probation in the Presentence Report ("PSR"). For the reasons explained below, a sentence within that Guidelines range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A.   Factual Background**

      **1.   A Dark-Web Vendor Who Serviced Drug Dealers and Computer Hackers Used an Illegal Money-Transmitting Business to Fund the Conversion of Cryptocurrency to Cash**

      From at least July 2021 through at least September 2023, several individuals, including the defendant, were involved in a conspiracy to operate, and did in fact operate, an unlicensed money-transmitting business. The money-transmitting business had two sets of customers: customers who wanted to convert cryptocurrency to cash and customers of a traditional "hawala" who wanted to transfer money to individuals in India by avoiding the regulated banking system.[1] (PSR ¶ 14.)

---

[1] A "hawala" is a term that refers to an unregulated method of transferring money—usually internationally—from one person to another without the money being physically transported from one location another. Rather, someone who seeks to have money transferred relies on brokers who

With respect to the cryptocurrency-to-cash conversions, in or about April 2021, law enforcement identified a vendor (the "Vendor") on the dark web who was offering to convert cryptocurrency into cash in exchange for a fee. That is, the Vendor would accept cryptocurrency from a customer, convert a part of that cryptocurrency into cash that was shipped to that customer via the United States Postal Service ("USPS"), and keep the remaining part of the cryptocurrency as payment for the conversion. The Vendor told an undercover officer in an online chat that the customers of the cryptocurrency-to-cash business included drug dealers and computer hackers. (PSR ¶ 15.)

To provide the cash for the cryptocurrency-to-cash customers, the Vendor turned to a hawala network that operated in the United States and India. In the United States, the Vendor worked with individuals like the defendant, who would collect U.S. currency from hawala customers in the eastern United States who wanted to transfer funds to individuals in India. (PSR ¶ 17.) That U.S. currency would then be mailed to cryptocurrency-to-cash customers in exchange for cryptocurrency. (PSR ¶¶ 14-17.) Using the cryptocurrency received from those customers, the Vendor would then transfer funds to members of the hawala network based in India, who, in turn, arranged the disbursement of Indian rupees to the individuals in India designated by the U.S.-based hawala customers. (PSR ¶¶ 14, 16-17.) Accordingly, the cash collected by the defendant and his co-conspirators served to fund both illegal shipments of U.S. currency to cryptocurrency-to-cash customers in the United States and illegal transfers of Indian rupees to hawala customers in India outside the regulated banking system. (*See* PSR ¶¶ 14-17.)

### 2. The Defendant Delivered Cash Totaling Approximately $7.7 Million Dollars

Beginning in or about February 2023, law enforcement began working with a confidential source ("CS-1") who would arrange the controlled pick-up of cash from the defendant and other operators of the hawala, package the cash, and then drop off the packages at a USPS post office for delivery to the cryptocurrency-to-cash customers. The defendant and his co-conspirators collected and delivered the cash to CS-1 in either Tarrytown or Port Chester, New York, and the amount of cash typically ranged from $100,000 to $300,000 at a time. From February 10, 2023, through September 27, 2023, CS-1, as part of his cooperation with law enforcement, arranged and participated in 80 controlled pick-ups of cash totaling approximately $15,067,000. (PSR ¶¶ 14(b), 16-18.)

Between on or about February 27, 2023 through September 27, 2023, the defendant made bulk cash deliveries 42 times to CS-1 in amounts between approximately $150,000 and $250,000, totaling approximately $7,729,620 in cash.[2] For each of the 42 transactions, the defendant worked with his co-defendant Rajeshkumar Patel. Neither the money-transmitting business, the defendant,

---

use their own capital to disburse money and informal ledgers to track the receipt and disbursal of money. *See United States v. Banki*, 685 F.3d 99, 103 (2d Cir. 2012); https://www.investopedia.com/terms/h/hawala.asp.

[2] The Government mistakenly omitted one of the transactions when describing the offense conduct to Probation, which led to a slight underreporting of the total number of transactions and the total amount of money the defendant delivered over the course of the investigation. This change—from $7,579,720 to $7,729,620—does not change the Guidelines calculation.

nor any of the defendant's co-conspirators were licensed or registered to operate as a money-transmitting business in New York or under Federal law. (PSR ¶ 21.)

**B.  The Plea and Guidelines Calculation**

On September 12, 2024, the defendant pleaded guilty, pursuant to a plea agreement, to one count of conspiracy to operate an unlicensed money-transmitting business, in violation of Title 18, United States Code, Section 371, and one count of operating an unlicensed money-transmitting business, in violation of Title 18, United States Code, Sections 1960 and 2.  (PSR ¶¶ 2-3, 5.)

As reflected in the parties' plea agreement, the applicable Guidelines range is 30 to 37 months' imprisonment calculated on the basis of an offense level of 19—a base offense level of 24 tied to the total amount of funds transmitted by the defendant, minus two levels for meeting the criteria under U.S.S.G. § 4C1.1, and another three-level deduction for the defendant's timely acceptance of responsibility—and Criminal History Category I. Probation agrees with the Guidelines Range calculation in the PSR. (PSR ¶ 6; *accord* PSR ¶¶ 28-37, 40, 71.)

Probation recommends a sentence of 24 months' imprisonment and 2 years' supervised release.  (PSR at pp. 19-20).  Probation notes that on the one hand, the criminal conduct was "long in duration and involved a substantial amount of money," so "substantial punishment is justified, especially in the interests of promoting general deterrence; the unregulated transfer of money facilitates a wide range of criminal activity." (PSR at p. 20.) On the other hand, Probation observes that the defendant "has no criminal history, a strong employment history, has exhibited positive post-arrest behavior, and he has no mental health or substance use history."  (PSR at p. 20).

The defense seeks "a noncustodial sentence." Dkt. 139 ("Def. Sub.") at 2. It argues that the Guidelines' reliance on loss amount is inappropriate because there was no "loss," and there was no use of "violence" in obtaining the funds. Def. Sub. at 5-6 According to the defense, the defendant delivered "modest sums" of money that were "received from hardworking immigrants from India whose only goal was to help alleviate the abject poverty that their families had faced."[3] Def. Sub. at 6. The defense further indicates that Mr. Patel's role was minimal because his participation was "limited to making deliveries" and he "made zero profits from the scheme." Def. Sub. at 6. Finally, defense counsel contends that the defendant is a family man who has worked hard, sacrificed, and is committed to helping others. Def. Sub. at 7-12.

**C.  Discussion**

  **1.  Applicable Law**

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."  *Gall v. United States*, 552 U.S. 38, 46 (2007).

---

[3] The FBI's investigation did not determine whether the persons who provided the hard cash had properly reported the thousands of dollars to the IRS for tax purposes.

Thus, district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After calculating the applicable Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence for criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Sentence Within the Applicable Guidelines Range Is Appropriate

The Government respectfully submits that a sentence within the applicable Guidelines range of 30 to 37 months' imprisonment is sufficient but not greater than necessary to comply with the purposes of sentencing, taking into account the factors set forth in 18 U.S.C. § 3553(a). In particular, the nature and seriousness of the offense, the need to promote respect for the law, and the need to promote adequate deterrence all cut in favor of a sentence within the Guidelines range.

*First*, a sentence within the Guidelines range would reflect the seriousness of the defendant's offense. The regulation of money-transmitting businesses helps to limit the ability of criminals—like the drug dealers and hackers who used the money transmitting business that the defendant was involved in—to move and launder money in connection with criminal activities. Hawala networks that successfully evade law enforcement have become essential to the functioning of criminal organizations. Not only do they allow criminals to enjoy the profits from their crimes, they also make further criminal activity possible by allowing criminals to continue financing their operations. Indeed, the statutes violated by the defendant and his co-conspirators here are designed to prevent the movement of funds in connection with drug dealing and terrorism, among other forms of money laundering. See H.R. Rep. No. 107-250, at 33, 54 (2001). Thus, as Congress recognized, efforts to evade the regulated financial system (and the due diligence and know-your-customer requirements that system entails) present a serious danger, in addition to

depriving U.S. regulators and financial institutions of taxes and fees normally associated with transmitting money.

Although the Government does not contend that the defendant here had direct knowledge that particular hackers or drug dealers were among the recipients of cash he collected and delivered to CS-1, the illicit nature of the defendant's conduct nonetheless should have been clear to the defendant by his suspicious actions—42 parking-lot cash exchanges where the defendant dropped off shopping bags with bundles of cash totaling more than $7.7 million to CS-1, whom the defendant did not know personally and with whom the defendant communicated using coded language and trade craft, as part of a larger money transmitting business that moved tens of millions of dollars. (PSR ¶¶ 14-20.)

*Second*, a sentence within the Guidelines range is also necessary to afford adequate specific and general deterrence and to promote respect for the law. Although the defendant does not have any prior convictions, he was a repeat participant in the illegal money-transmitting business, making 42 deliveries observed by law enforcement. The sentence here must be fashioned to deter the defendant from future criminal conduct and deter others who might consider making easy money by delivering bundles of cash that make their way into the hands of criminals.

Moreover, the prospect of general deterrence and promotion of respect for the law in the case is not a mere hypothetical. Without any prompting from the Government,[4] the charges in this case have been covered both in prominent industry publications relating to cryptocurrency and in international publications covering India-related news.[5] There is no question that those who would use cryptocurrency and/or hawala networks to illegally transmit money need to be deterred, and the coverage afforded to enforcement efforts such as the Government's in this case provides an important tool in doing so.

---

[4] As of the date of the Government's sentencing memorandum, the Government has not issued a press release or made any comment to the media regarding this case.

[5] *See, e.g.*, Amitoj Singh, "FBI Charges 6 for Allegedly Running $30M Money Transmitting Business Using Crypto," CoinDesk, Oct. 20, 2023, https://www.coindesk.com/policy/2023/10/20/fbi-charges-6-for-allegedly-running-30m-money-transmitting-business-using-crypto/; Trent Alan, "FBI Charges Six in Connection with $30M Crypto Crime Ring," Cryptonews, last updated October 23, 2023, https://cryptonews.com/news/fbi-charges-six-connection-30m-crypto-crime-ring/; Joseph Cox, "Inside a $30 Million Cash-for-Bitcoin Laundering Ring in the Heart of New York," Oct. 20, 2023, https://www.404media.co/inside-a-30-million-cash-for-bitcoin-laundering-ring-in-the-heart-of-new-york/; HT News Desk, "How 5 Indian Americans allegedly laundered $30m in Cash-for-Bitcoin scam in New York," Hindustan Times, Oct. 25, 2023, https://www.hindustantimes.com/world-news/us-news/how-5-indian-americans-allegedly-laundered-30m-in-cash-for-bitcoin-scam-in-new-york-101698224423811.html; LiveMint, "FBI Exposes Million-Dollar Crypto Scam Orchestrated By Six Indians in New York: Report," Oct. 25, 2023, https://www.livemint.com/market/cryptocurrency/fbi-exposes-million-dollar-crypto-scam-orchestrated-by-six-indians-in-new-york-11698221347016.html.

Finally, the mitigating factors identified by the defense do not support a downward variance. The Government acknowledges that the defendant has no prior convictions, did not use violence in committing his crimes, and appears to be remorseful. But these factors are all accounted for in the defendant's Guidelines calculation—specifically, in the zero criminal history points and two-point offense-level reduction pursuant to U.S.S.G. § 4C1.1(1), (3) and (4) and his the three-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b)—and resulting Guidelines range. At best, these factors (along with what appears to be the defendant's otherwise law-abiding life) warrant a sentence at the lower end of the Guidelines range.

### D. Defense Counsel's Arguments Do Not Support a Downward Variance

The defense argues that the Guidelines Range is an inappropriate measure of the defendant's criminal conduct because it relies on "loss" when the money was not obtained through violence and went to its intended recipients (*i.e.*, families in India). Def. Sub. 6. The defense misses the point. The criminal offense punished here is not sending rupees home to India, but moving millions of dollars in cash throughout the United States and abroad through illegal means. This is clear from the other half of the transaction: the defendant delivered stacks of U.S. currency as part of a network that aided criminals—hackers and drug dealers—whose goal in engaging the hawala was to get their hands on hard cash while avoiding detection by law enforcement and regulatory authorities. The defendant's actions, along with those of his co-defendants, made that happen.

Although defense counsel raises the potential for a sentencing disparity, it fails to address the inequity of a time-served sentence given the sentences his five co-conspirators, who pled to the same charges and fell into the same criminal history category and were differentiated largely by the amount of money they had delivered:

| Co-Defendant | Conduct | Sentence |
| --- | --- | --- |
| Rajendrakumar Patel | 58 cash deliveries totaling approximately $10.8 million | 27 months of imprisonment |
| Brijeshkumar Patel | 11 cash deliveries totaling approximately $2.2 million | 18 months of imprisonment |
| Naineshkumar Patel | 5 cash deliveries totaling approximately $1.45 million[6] | 12 months and one day of imprisonment |
| Nileshkumar Patel | 2 cash deliveries totaling approximately $370,000 | 3 years of probation |
| Shaileshkumar Goyani | 2 cash deliveries totaling approximately $320,900 | Time served |

---

[6] Naineshkumar Patel's sentencing accounts for his health issues and other mitigating factors.

Applying this metric, the defendant's sentence should be between Rajendrakumar Patel's sentence of 27 months' imprisonment, which is just below the defendant's Guidelines Range, and Brijeshkumar Patel's sentence of 18 months' imprisonment.

Finally, with respect to the collateral consequences, defense's citations to *United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) and *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) are distinguishable. Both those cases dealt largely with the collateral consequence of a felony conviction on long-term career prospects (in *Nesbeth*, a career as a teacher and a principal and in *Stewart*, a career as an academic or translator). Here, there is no alleged similar impact on the defendant's employment prospects, and defense counsel has not identified any other collateral consequence of similar import. Indeed, during his pre-trial release, the defendant has been employed at the same job he had prior to pleading guilty. (PSR ¶ 64.)

In sum, a sentence within the applicable Guidelines range would adequately balance the various considerations under § 3553(a) and would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.[7]

**E.  Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Guidelines Range.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:  _____
Timothy Ly
Benjamin Levander
Assistant United States Attorneys
Tel: (212) 637-1062 / (914) 993-1930

cc:   Barry S. Zone, Esq.

---

[7] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court imposes, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g., United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).